The Honorable, the Judges of the United States Court of Appeals for the 8th Circuit. Hear ye, hear ye, hear ye. The United States Court of Appeals for the 8th Circuit is now in session. All persons having business before this Honorable Court may now draw near and they will be heard. God save the United States and this Honorable Court. Good morning and thank you to Council for joining us for this argument session. The Court has five cases set. I don't know if five cases is the right way to put it when the first case has six cases within it. But we have five items on the calendar and Madam Clerk, would you please call the first set of cases for argument? Thank you. My understanding is we have four lawyers scheduled to argue. The time has been divided among them. No time is reserved for rebuttal and so we'll hear from four counsel and then from the government. Mr. Richman, we'll hear from you first. Thank you, Your Honor. May it please the Court, my name is Robert Richman. I represent Michael Morris. Mr. Morris was one of five defendants convicted at trial of a sex trafficking conspiracy. He was the only one of the five who was also charged and convicted of a substantive offense of sex trafficking under 18 U.S.C. 1591A. As a result, he alone is subject to a 15-year mandatory minimum penalty and is ineligible for additional good time in the Bureau of Prisons. The substantive offense alleged that Mr. Morris trafficked a woman who testified that had she known how much money she could make, she would have come to the United States sooner. Mr. Morris' sole involvement with Ms. Boonlea is he made her dinner one night and took her to a store. I'm going to rely on my briefs for the sufficiency of the evidence and will focus my argument today on the issue of venue. All of Mr. Morris' activities occurred in the state of California. Venue in Minnesota was inappropriate. The evidence established that for 15 days Ms. Boonlea acted as a prostitute in a brothel run by a co-defendant who went by the name Maya in January of 2010. The offense ended when Maya left California in January of 2010 and went to other districts to continue her activities. The government argues that Ms. Boonlea was trafficked in both California and Minnesota and while that is true, there was no evidence that Mr. Morris aided and abetted the activity in Minnesota. 1591A is not a continuing offense. To commit the offense, you have to recruit, entice, harbor, and so on with the requisite mens rea and the offense is complete when that act has been completed. Here the offense ended in California. So there is a significant distinction between a conspiracy charge where the offense can be charged in any district in which any of the conspirators committed an act in furtherance of the conspiracy and a substantive offense which must be charged where the defendant committed the offense, here California. The government does not seriously dispute that in its brief. Instead, it argues that Mr. Morris waived the argument by failing to ask for a jury instruction on venue. But Mr. Morris preserved his objection to venue by raising it in a post-trial motion for judgment of acquittal under Rule 29C. Every circuit that has considered the issue has held that an issue raised in a timely motion under 29C is properly preserved for plenary review on appeal. Rule 29C.3 makes clear that a motion for judgment of acquittal at the close of the evidence is not a prerequisite to raising the issue following the verdict on 29C. The cases cited by the government are not to the contrary. They merely state that an objection to venue is preserved if it is made at the close of the evidence. In the cases cited by the government, this court did not have the opportunity to consider whether the issue would also be properly preserved if made in a timely 29C motion. Every court that has considered that issue has said that it is properly raised. And so what we have is a case where Mr. Morris had very minimal involvement with Ms. Boonlea. He never set foot in the state of Minnesota until he was extradited there for trial. He had no dealings with anyone in Minnesota. There was simply no basis for this case to be brought in the District of Minnesota. It should properly have been prosecuted in the Central District of California. Unless there are questions from the panel, I would reserve the rest of my time to co-counsel and I ask the court to reverse the conviction on count two and remand for resentencing. I do have a question, Mr. Richmond, about your venue argument. What about any kind of communications between Mr. Morris and the boss known as M in Minnesota? Is there any aspect of the crime that he was convicted of that took place in Minnesota because of that communication and coordination? There is evidence that M was in Minnesota following January of 2010. But I don't believe there is any evidence that there were communications between Mr. Morris and M, number one, while M was in Minnesota, and number two, in relation to Ms. Boonlea. There are no communications relating to the sex trafficking of Ms. Boonlea. While Mr. Morris may have implicated himself in other crimes in Minnesota, I don't believe there is any evidence implicating him with respect to Ms. Boonlea. Now, do you say that the claim is reviewed for plain error or under a normal standard of review? I thought there was some discussion in your brief about plain error. Well, the government took the position that there was waiver, and there is a case in which the issue had not been preserved in the district court, and the court said there was forfeiture subject to plain error review, not waiver. It's our position that there was neither waiver nor forfeiture, and the issue is properly preserved and is subject to de novo review on the failure of the district court to grant judgment of acquittal. Well, the case that you're referring to that said there was a forfeiture, did that involve a motion like... No, there was nothing in the district court preserving the issue as there is in this case, and the court found that was an inadvertent error, and therefore there was forfeiture, but it's our position that this is not plain error review, it's de novo review. All right, thank you for your argument. Mr. Ng, we'll hear from you next. Good morning. May it please the court, Pauling, on behalf of Ms. Thinran, she presents a different argument, but one that is equally as compelling. The question for her in this case is whether or not she can be both a co-conspirator and thus responsible for her own victimization during the same conspiracy for which she's been convicted. Put another way, our claim is that she cannot be both a perpetrator of her victimization and the victim herself. She's unique in this case in that she was much like all the other women who were brought here from Thailand. She started in the sex trade quite early. She married when she was 14 to a 44-year-old man. She was recruited to come here. She was given a false visa, which listed a false company and a false stay period. She was flown to California like all the other women were and placed in a hotel in that city and all the other major cities across the country where she was sold to men in quantities up to 10 a day. She was all of these things, and there's no question in the proof that the government agrees with that. I got the two agents to admit that she was a victim of this very conspiracy that she's been charged with, or conspiracies. The government agreed both at the judgment of acquittal and post-trial sentencing that she was a victim of this crime. The judge himself, Judge Frank, agreed that she was a victim. She's a victim of her own crime. The error and the problem that we had at trial concerned the standard instructions that were given in the ordinary conspiracy case. Those were that once a defendant joins a conspiracy, he or she is responsible for all the acts in the conspiracy that take place, no matter when the joiner is. The government vociferously argued this to the jury, claiming, quotes, if you are in a conspiracy, you are responsible for the acts of everyone. She also argued each member is an agent or partner of every other member, and every member is bound or responsible for the acts of every other member done to further their scheme. Did the instructions on multiple conspiracies, when you looked at that instruction in combination with the one that you described, didn't that give the jury the opportunity to basically accept your argument that there were two separate conspiracies here? Well, I disagree with the posit there. We did get a multiple conspiracy instruction, but Judge Frank specifically rejected the proposed instruction number two at docket 976, which is my statement of law that, quotes, the law does not permit an individual to be both a victim of a crime and its perpetrator. That is, in our view, a statement of law that's irrefutable. The other instruction I asked, which the judge rejected, was the common, quotes, the common criminal goal of the conspiracy cannot include the defendant's own victimization by her co-conspirators. So, in one respect, yes, we did argue the multiple conspiracy issue, but we didn't get the instructions that went further in the case that say you cannot be a perpetrator and a victim of the same crime. And it's really a frustrating situation here for her. The nature of sexual trafficking or sex trafficking is coercion, that's the central element. Coerced sex is non-consensual sex, of course, and non-consensual sex is rape. And under the government's theory, Ms. Stinran was raped repeatedly by her co-conspirators and the men that they secured financing from for a number of years in the conspiracy. And it is absurd, quite frankly, and illogical, for her to be convicted of such a crime when she was a victim. I think the problem here is that the nature of trauma and the research of trauma has not caught up with the law or the instructions that are quite standard in most conspiracy cases. The judge found that she was a trauma victim, and the social sciences which I've touched on in the brief and also the sentencing pleadings are that when a victim is traumatized, particularly by a sexual offense, and hear multiple rapes, the trauma doesn't necessarily disappear, you can't just shut it off. For some people, they can go on, and those are mentioned in the resiliency studies, but for some people who are traumatized, particularly these women, and they all testify they were traumatized, it was rather brutal what happened to them, to say the least, the trauma continues over time. And so the behavior of trauma victims is often repeated to the extent that they don't even realize that they're being re-traumatized because they have been experiencing that for the bulk of their lives, and that's true of Ms. Dinneran. Was there testimony about that at the trial? Well, we had expert testimony that the women were traumatized, that the debt bonding was traumatizing, that they were completely coerced throughout the course of the bondage, and that many went into it afterwards because of the behavior that was learned. So I mean, it was touched on both at sentencing and at the trial, but my point here is that she is a trauma victim by concession throughout the course of the conspiracy, it just didn't go away, and she's been convicted of it, and she's in prison for it. So what I would like in my 17 seconds left is a paragraph in your opinion that says the claim is that a victim cannot be the perpetrator of a conspiracy, we agree that that is illogical, particularly in a sex trafficking case. My time is up, I don't want to take any more time from my esteemed colleagues, but I ask you to reverse all convictions. Very well, thank you for your argument. Mr. Goertz, we'll hear from you next. Thank you, your honor. I'd like to focus my time on the restitution and forfeiture arguments that are presented in my brief. To begin, I think I'd like to start with a statement, a false statement in the government's brief, this is on page 57. It says that by participating in the conspiracy, Ms. Imprada may be held jointly and severally liable with her conspirators for victim's restitution amounts, even if she was not personally responsible for the loss. Now the reason that's false is because there's a conflation here between the provisions of the Mandatory Victims Restitution Act, which the government concedes does not apply to this case, and the Trafficking Victims Protection Act, which it concedes is the proper restitution statute applicable to this case. The Mandatory Victims Restitution Act defines a victim to include a person harmed by a defendant's criminal conduct in the course of a scheme or a conspiracy. The Trafficking Victims Protection Act includes no such provision for conspiratorial liability. The only way that a person can be jointly and severably liable under the TVPA is through the application of section 3664H, which permits a joint and several liability upon a finding that the defendant contributed to the loss. In other words, there is no Pinkerton liability under this statute. There has to be a finding supported by a preponderance of the evidence that Ms. Imprada contributed to the loss of the 17 identified victims. Now, as you'll understand from my brief, the lack of proof on this issue is very substantial. Whether any of these people are really victims of this conspiracy is hard to tell. They were not mentioned at trial, not mentioned in the indictment, didn't appear in the discovery. They simply submitted these claims. Whether they really are or not, however, the court must have had a preponderance of the evidence to find that Ms. Imprada contributed to their losses. And the losses in this case are the special losses that are identified under the TVPA. Those losses are the ill-gotten gains, as it were, the profits from their work. There is no evidence that Ms. Imprada ever met any of these people. There is no evidence that any of these people knew who Ms. Imprada was. There is no evidence that Ms. Imprada solicited, recruited any of these people, that she advertised for these people, that she received any income of any sort from any of these people whatsoever. There is simply no evidence upon which the court could base a finding of restitution against Ms. Imprada in favor of these alleged victims. I do have a question about the victims linked to the conspiracy. Some of the victim impact statements vary in their detail and the names that are included in them. It looked to me like in the government's response at the district court that they did sort of link up some of these victims to at least someone in the conspiracy, not necessarily your client. But did you object or do you disagree with that filing in the district court that linked up certain victims to a person who was involved in the conspiracy? I think I conceded in my brief there were a few of these people who either were mentioned at the trial or by virtue of their statements knew someone in this conspiracy. I think there's at least a couple people who mentioned Mr. Morris. But there is nobody, of course, who mentions Ms. Imprada because none of them knew who she was and Ms. Imprada didn't contribute in any way to their losses. I guess maybe my more direct question is putting aside your, I understand your argument that your client is not connected to these folks. But it looked like maybe up to, you know, you named maybe four in your briefing that you conceded were connected. And then I think the government tries to link up maybe another nine or ten. Are you saying that those links aren't sufficient or is your argument simply remaining that it's not your client? Both, Your Honor. Both. And first, some of them here have no connection whatsoever to this conspiracy. I agree that there are some that show some connection to some people related. But under this statute, the government has to prove by a preponderance that Ms. Imprada did in fact somehow benefit from their losses or contribute to their losses. And we know that the District Court's first order on this, that's a docket 1793, simply, no excuse me. It found, yeah, 1793, it found that the restitution was tailored to Ms. Imprada's role in a greater scheme. Which simply cannot be the basis for a finding under this statute. And I'd like to turn just with the brief time I have left to the forfeiture issue. The primary issue on forfeiture is the lack of procedural due process that was denied to Ms. Imprada. The District Court acknowledged, well, first of all, it denied the request for a new jury, which it can do, I concede. But then it also denied the request for a hearing that is required under Rule 32.2. Simply saying it didn't think it was necessary. But the rule does not provide that it be provided to the defendant on a basis of a necessity finding. So that was clear error. And unless there's any questions, my time is up. What would be the purpose of a hearing? The purpose of a hearing would be for the purpose of presenting evidence and argument on whether, for example, the phones are properly forfeited as being connected to this crime. And we were not given that opportunity. But did you proffer any evidence that you want to submit? Are you talking about the government submitting evidence? We did not proffer the evidence. We asked for the hearing, assuming that at the hearing we would be permitted to present the evidence. Okay, so I'm asking you now, if there was error, and we're trying to determine whether your client's substantial rights were affected by the error, what would be the purpose you wanted to produce at a hearing that would make any difference? As I pointed out in the brief, there is evidence that these phones, for example, could not have been connected with the conspiracy because they were not even purchased until after Ms. Proudett's participation in the conspiracy. That there was no evidence on the phones themselves that they connected them. All right, thank you for your argument. One of you has your e-mail program open, and we're hearing a chime every time you get an e-mail. We've had about seven e-mails now, so I'd ask whoever has your e-mail program open to please close it. And if you're not addressing the court, please put your microphone on mute. Mr. Eng, I don't think you're on mute. I'm trying to figure out how to do it, actually. I thought maybe you'd know. This is your first time muting yourself. There you go. Okay. Thank you. Ms. Campoli, we'll hear from you next. Thank you, Your Honors. May it please the court. Today I will ask the court to vacate Ms. Wanless's convictions because these convictions were purposely architected out of known, inadmissible, and undisclosed physical evidence of a co-defendant's apartment from a separate and dismissed 2013 conspiracy case that is separate and irrelevant to this case. I will ask the court to also consider that the prosecutors in this case utilized a knowingly false theory of guilt that Ms. Wanless was at the height of this conspiracy in 2014 and 2016 due to two same-day hotel charges on her Wells Fargo bank statement. Receipts of these stays have been provided to the district court, and the district court has remained silent on the issue and the government has essentially confessed it as they have not argued the validity or the truthfulness of the running girls from hotels theory in any post-conviction filing. Now, after two years of post-conviction investigation, subpoenas that I issued to Investigator Sergeant McFarland in the 2013 Addison case, and the appellate process itself, which caused me to understand the full extent of the legal ramifications of the government's actions, I come before the court today confidently saying that Ms. Wanless is, by operation of law, actually innocent. I'm going to argue three things and probably just have enough time for two. I'm going to begin at the Brady violations and the prosecutorial misconduct. The court is also holding for consideration a motion to supplement, which I will discuss in the first point of my Brady argument, which is that the government suppressed evidence. Of course, the court knows the well-known three-part test of a Brady violation. First, the government suppressed evidence. That evidence was favorable and material, and there is a reasonable likelihood that without that suppression, there would have been a different result in the proceeding. I do not need to show that there would have been an acquittal, although in this case, I think I can. In this case, the government violated its Brady obligations, resulting in due process violations. I understand the standard of review on a motion for a new trial on a Brady ground is that of abuse of discretion. However, in U.S. v. Dodd, the district court abuses this. I'm sorry. In U.S. v. Dodd, that case explains that a district court abuses its discretion if it fails to consider a factor that should have been given significant weight or maybe gives weight to an irrelevant factor or commits a clear error. Also, as your Honorable Carlton has already opined in the San Sebastian case, a violation of due process rights arising from a non-disclosure should be reviewed de novo. I'm going to argue that actually in this case, there are grounds to review this case in a de novo review. But even if we stick with abuse of discretion here, that Honorable Frank failed to give any consideration at all to these significant evidentiary issues and just dismissed them in a footnote. His ruling coming on the same exact day of Ms. Wanless's reply to the government's untimely overnight filing made to handicap Ms. Wanless's reply. Here, the district court failed to consider these significant evidentiary issues and the court should find, accordingly, abuse of discretion. The government suppressed the evidence because what we have on May 24, 2017 was agents of HSI Dallas went to Ms. Wanless's house. She was driving for Uber at the time. She was arrested and handed over her iPhone 7 and its passcode. That is what she was using at the time. The evidence taken at her home was disclosed simply as this. Two laptops, ten cell phones, miscellaneous documents in unenumerated quantity. There were five lying items in one box, and this was disclosed on a single custody receipt doubling as the government's inventory list. The government suppressed the valid inventory list of all the items it received from Ms. Wanless's consent search at the colony. The government further suppressed a valid chain of custody to authenticate or lay any kind of foundation for where the evidence was actually from. Who shipped it, and how did the government get possession of it? The government suppressed any and all police reports from the colony 2017 search that would discuss exactly what was found, where it was found in Ms. Wanless's home, and who found it. The government suppressed its unique knowledge of what was in a second box and that second box contained inadmissible evidence from the apartment of Casey Benson in 2013 in an unrelated, dismissed, and discredited by its felonious agents unrelated to a 2013 state case. I have a question about those documents. I understand that if I'm understanding factually what happened is that those were taken from this other person's home. Is it Mr. Casey? But I understood that they then, for whatever reason, were found in your client's home in 2017. Is that correct? I have no idea, Honorable Kelly. There is no documentation whatsoever to corroborate the government's literally just, on its own word, presumption or statement that it was rediscovered in Ms. Wanless's 2017 home. There is nothing. There is no evidence. There is no incident report. There is no police report. There is nothing but the government's word that this evidence was rediscovered in Ms. Wanless's 2017 home. How was the evidence admitted in the trial? Well, Your Honor, that's a great question. It was admitted together, 11-20, 11-21, and 11-22, which is a debt ledger conclusive of Ms. Wanless's guilt, a red folder in bank documents and checkbooks, as well as an ID card. I know what the documents are. How were they admitted? Who was the witness who laid the foundation? Was there a stipulation? How were they admitted is my question. Yes, they were admitted through Agent John Cheetah, a Jack of all trades testifier who was not the agent who got these materials from Ms. Wanless's home. He was just an IRS agent, and Ms. Provenzino sought a stipulation from trial counsel, that is, Mr. Rivers at the time, that the chain of custody, that the admissibility was stipulated to. So trial counsel didn't object to it. Trial counsel did not know that these were the upcycled dregs of Casey Benson's case. What evidence do you have that the stipulation was false? Well, Your Honor, I have evidence that the stipulation was false because the government didn't disclose to Mr. Rivers in any fashion beyond their saying they had this off-the-record conversation with Mr. Rivers that he knew that some of this evidence was rediscovered in Ms. Wanless's 2017 residence. But at the trial, Your Honor, Ms. Provenzino commits prosecutorial misconduct when she tells Mr. Rivers, oh, no, no, these documents and this evidence, this debt ledger wasn't from the 2013 case. She affirmatively says, no, it's not from the Addison case. He says, I thought it was from there. And she says, no, it was not from there at all. So this is where they cross over the line from they don't disclose what exactly they got, they don't disclose the nature of the evidence, and they tell Mr. Rivers it is affirmatively not from the Addison case. Then further, Ms. Williams cements this victory by bringing this inadmissible debt ledger up at closing argument and says, we didn't hear from Wan about the ledger, the ledger that shows she's keeping a victim's debts. Now, the ledger was inadmissible on a number of grounds. It was 401, it was irrelevant. 403, it was more prejudicial and probative. 404B, it was inadmissible character evidence. The Addison case was not the case they were trying. They told Ms. Wallace she was being prosecuted for other acts. She was being prosecuted for running women from hotels and having association with June. That had nothing to do with Addison. And the nexus to the Addison case, which was noon, they presumed, they tried the link, was not there. And I know your Honor, Honorable Kelly, was asking about a link between these different actors. And that is significant because in conspiracy law, you cannot use evidence from one conspiracy to say someone is a member of another conspiracy and that's U.S. versus Ross now. So I would argue that in this case, it was completely inadmissible evidence from the get-go. They hid and concealed this inadmissible evidence. And an evidence viewing is not going to cure it. And if your Honors need further on that, I would urge your Honors to grant the motion to supplement so you can see for yourselves the inadmissible, absolutely incredible, up-cycled evidence of a co-defendant in an unrelated 2013 case. And finally, it just... All right, I believe your time has expired. I'm sorry. Thank you so much. Thank you for your argument. Thank you. Mr. Genrich, we'll hear from you. Thank you, your Honor. May it please the court. Good morning, counsel. AUSA David Genrich on behalf of the government. I'm trying not to talk too quickly, but I suspect this time will go fast. What I plan to do is provide a few overview points before getting to the specific arguments of defendants. I think what I'll do is answer each of the questions the court asks defense counsel, even though they're out of order, just to make sure I address them. And then I'll turn to the specific arguments, probably focusing primarily on the arguments made by counsel this morning. By way of introduction, I think I'd like to touch on four things. First, I'd like to touch on the evidence. Although I'm about to talk about narrow matters of evidence and narrow issues in the record, really none of the defendants contest that this was a large, sophisticated, long-standing conspiracy that victimized hundreds of women and generated tens of millions of dollars for the enterprise. They don't contest that the roles in the conspiracy included traffickers in Thailand, house bosses, runners, facilitators, and money launderers in the United States. And they don't contest that the evidence of that conspiracy was overwhelming. The reason I wanted to briefly touch on that before getting to the narrow issues is that the strength of that evidence, both direct and circumstantial with respect to these defendants, the reasonable inferences that Julie can draw from them, bear on this court's evaluation of the sufficiency of the verdicts and this court's evaluation of prejudice and harmless error. So I didn't want to proceed without having that as a backdrop, even if I don't discuss that larger context of the evidence. The second general area is what the defendants contest. Now, count one is the sex trafficking conspiracy, which requires it be committed by means of force, threats of force, fraud, or coercion. And that has been put very much at issue by most of the defendants, defendant Morris perhaps notwithstanding, who only challenges count two. But the defendants were also convicted of count three through five. Count three is a man-at conspiracy. It doesn't require that those means be used. It's the transportation of women in interstate commerce for purposes of prostitution. Count four is money laundering, which is proceeds derived both from the sex trafficking conspiracy and the man-at conspiracy alleged in count three. And count five is using communication facilities for the man-at violation, for the transportation conspiracy. And when the court considers the case, the government would suggest that very little of what the defendants argue, most of the defendants argue, relate to those counts. And I'd specifically point out that counts three and five have separate overt act requirements that were alleged with respect to victims that were not Ms. Thin-Ram or Ms. Woonkradit, that the jury had to be unanimous as to those overt acts. And there's really no danger whatsoever that the jury convicted on the basis of the defendants' victimization, before I turned to Thin-Ram's arguments in particular. So, counts three through five, the government believes, are untouched or largely untouched in the case. With respect to the standards of review, again, I don't want to take time addressing them as to each claim, but they're very deferential in this case, as the court knows, both with respect to jury verdicts and court orders and the waiver and plein air standards that the government suggests apply here. And finally, although Ms. Rutamantongo waived her argument, I wanted to note that in reply, she indicates that the government misstated in its brief a reference to Pinoy and mixed up Pinoy-Rutamantongo with other Pinoys in the case. The government's view is that that evidence, that excerpt of the transcript that the witness Noon was talking about, that Noon was indeed talking about Rutamantongo informing Noon that Piano, who is one of the trafficked victims, had first been sent by the trafficker Odd to Korea before being sent to the U.S. But, because if the court determines that it's ambiguous as to whether Noon was referring to Rutamantongo or another Pinoy, I just wanted to note that the reason the government included that in the brief was to establish that Rutamantongo was aware of the international scope of conspiracy and that it was established by other evidence, including evidence in the government's brief, emails that originated in photography studios in Thailand, as well as her possession of documents of Thai victims. It would be helpful if you could address the arguments that were raised this morning by the defendants. Yes, Your Honor. Now, with respect to the question, I appreciate it very much, Your Honor. With respect to the questions raised by the court, on the venue question, Judge Kelly asked if there were communications with him about Lily or in the time period alleged in the sets of account, and I don't believe so, Your Honor. At least I'm not aware of evidence in the record of such communications in that time period. Judge Kelly also asked whether, with respect to ThinRam's argument, the jury was given an opportunity to pass on his theory of a single conspiracy by virtue of all the instructions issued in the case, including the multiple conspiracy instruction, and the government's position as outlined in the brief is yes, that this has been presented as a sufficiency claim on a single and multiple conspiracy, and if you read the instructions taken as a whole, the jury was and did pass on defendant's theory of the defense. Judge Kelly asked about evidence of trauma in the record. Mr. Eng is right that there was expert testimony about trafficking, but I would note as it relates to acts and statements related to Ms. ThinRam that there was no evidence specifically about acts or statements of co-conspirators or Ms. ThinRam's trauma in the case. He relies on evidence related to other trafficked individuals. With respect to Improduct, Judge Kelly asked about links to the conspiracy victims, and the government agrees the joint, or suggests the joint level of federal liability applies, but there are certainly links to the specific conspiracy, and with respect to Forfeiture, Your Honor, Judge Colleton asked about the purpose of a hearing, and the government, the submissions with respect to the nexus of the cell phones were submitted for the first time in appeal. The government made an adequate showing below, and there is no prejudice with respect to the lack of a hearing, and with respect to- Mr. Gingrich, if I could follow up, you mentioned the part about the restitution. As I read the victim impact statements that are presented, I think it's in a sealed appendix, they do vary in their detail, and at least some, obviously the parties know the case, and the names, and the participants obviously better than I do, but some just don't really link their harm to anyone. What is the link in the record between some of these victims, and to even just this conspiracy generally? Your Honor, I do agree, that some of the declarations lack specificity as to particular circumstances in this conspiracy, to the extent they don't name individual people. But I note that the standard of review here is whether, by a preponderance, the restitution award is supported. So I'd say, one, the standard with respect to connection is very low, and that the earmarks of the trafficking that are described, even in the least detailed declarations, correspond to the details of this conspiracy. And the government believes there was no error with respect to a preponderance. Furthermore, Your Honor, those declarations support a restitution of award of $3.1 million. And the award in this case was $400,000. So the district court did calibrate to Ms. Unprada's participation, and did scale the award back from what the total amount of declarations were. To the extent, some maybe, if the court determined, were not the court's satisfaction supported by a preponderance, certainly there is enough here to support the restitution award. I'll address the one of those questions when I address her arguments. So turning to the arguments of each defendant, starting with Mr. Morris, who focuses this morning on venue. The government's position, and certainly the way in which the count was indicted, count two, is that Mr. Morris was guilty by sufficient evidence of aiding and abetting the trafficking of the victim, Lily, in that time period. And the individual, the MOTOC, who owned Lily, was M. And there's evidence in the record that the victim, Lily, traveled from Minnesota to Washington, D.C., in the time period alleged in count two. And really, it is, or should be, uncontroverted that the only reason Lily would have been in Minnesota was for trafficking activity, because she testified she was under debt bondage for the entire 15 months after she came to the U.S., and that she had no freedom of movement absent instruction from the MOTOC during that time. And this fell comfortably within that time period. Mr. Morris certainly, as a sufficiency matter, aided and abetted the trafficking of Lily while in California, both as a transportation matter that he asked medics to perform sex trafficking, and as defendants suggested, appearing in his own brief, as an enticement matter with respect to going to Maya's house of prostitution and preparing a meal for the victim. So what Morris did here by way of venue is he aided and abetted M's trafficking of Lunlea, which in this time period included contact with the District of Minnesota, and aided and abetted it with his acts in California. It is black-letter law of this court that venue extends to the district in which the principal commits the subsequent offense, the trafficking here by M of Lunlea, and that's U.S. v. Romero, 150 Feb. 3, 821, 8th Circuit, 1998. So what we're relying on here is on the aiding and abetting of M in the trafficking of Lunlea, and the sufficiency of the evidence is certainly both in the government's brief and in the comments here today with respect to what Mr. Morris did in California to further the trafficking, both alone and in a partnership with M. When was... You're getting a lot of feedback on your microphone there. When was the offense committed by M? What was the time range of the offense that you're describing that Morris aided and abetted? M trafficked Lunlea between the spring or summer of 2009 until the late summer, early fall of 2010, and Count 2, the time period alleged, is within those 15 months, and the evidence established that within the time period alleged in Count 2 that really was in Minnesota. So you're saying that M's offense continued for 15 months? The trafficking of Lunlea occurred within the time period alleged in Count 2 at minimum, yes. So it was a 15-month substantive offense by M that Morris aided and abetted? Is that what you're saying? It may have been, Your Honor, but I do want to pay respect to the indictment which alleged the time period shorter than 15 months. But yes, she was trafficked for 15 months by M. And when you say trafficked, what substantive offense was M committing, the same one that Morris was convicted of aiding and abetting? Yes. And what's your best authority that that is an offense that would continue for that period of time? The authority for it is that the substantive offense, which is trafficking Lunlea in these multiple districts, is attributable to Morris as a matter of venue because he aided and abetted M in California. Well, that's, you know, I meant, is there authority? I understood Morris to argue that this offense that you say was aided and abetted is not a continuing offense, that it doesn't last for 15 months throughout different activities, that it's a more confined offense in terms of time. And what the government is confining the offense to... I was asking what authority there is that it's a continuing offense of the sort that you're describing. Go ahead. I think, Your Honor, the government is using continuing  And so I'm not arguing the point about whether a substantive offense of sex trafficking absent in aiding and abetting theory where the victim, say, isn't in Minnesota in the time period alleged is a continuing offense. What I'm suggesting is that count two alleged that Lunlea was trafficked in the time period alleged in count two. That trafficking, that substantive offense, was M's trafficking of Lunlea in districts that included Minnesota as established by the travel document. It also included California. The continuing activity and the aiding and abetting is the use of the means specified in the sex trafficking statute to victimize Lunlea, Lily, the victim. Your Honor, if I could just move to the other... the other argument made by Morris with respect to waiver. Morris, in the government's view, is simply wrong. This court's black-letter law is that a defendant must raise venue at least no later than the close of the evidence. There are really two lines of authority in this circuit, starting with Black Cloud in 1970, Haley in 1974, Metz in 1985, and Morrissey in 2018. Those courts, those cases, all announced this black-letter rule that venue, which Morrissey discussed the reasons why venue is different and special and treated differently, must be raised either before trial if it's apparent on the face of the indictment or no later than the close of the evidence. Now, there's a separate, arguably, line of authority starting with McCorkle in 2012, which defendants cited in a footnote, and then a case decided since briefing in this case, and that's Mink, 8 Feb 3rd... 8 Feb 4th, 590, the 2021 case of this court, that does talk about plain error. So, the government has two responses to these two lines of authority. One, under the prior panel rule, Black Cloud, Haley, and Metz all control. Two, even if the court would decide that plain error applies, if there's not intentional relinquishment of waiver before the close of the evidence, Morris intentionally relinquished the right here, because what Morris did was make motions for judgments of acquittal at the close of the evidence, including challenges to venue on some counts, but not as to count to. And this court's Morrissey decision in footnote 6 explicitly says that where a defendant makes a Rule 29 motion at trial and doesn't raise grounds, and that's a venue case, doesn't raise venue, that the defendant has intentionally relinquished that right. He has waived venue. And that's exactly what happened here. The Rule 29 authority that Mr. Richmond cites is general Rule 29 authority, where those motions are brought instead of Rule 29 motions brought at trial. So they're both distinguishable on that grounds, but most importantly, they do not address these separate lines of venue-specific authority, both cited in the government's brief and discussed this morning. Why should the rule be different for venue? The rule is different for venue, and this is discussed in Morrissey, because venue is treated as an element of the offense, but as an element, not an element that is treated like the standard instructed elements in a number of ways. It only needs to be established by preponderance of the evidence. And to give the jury an opportunity to decide venue if it's challenged or the government an opportunity to repair the indictment if it's apparent on the face of the indictment, it has to be raised at or before the close of the evidence. And Mr. Richmond says, well, that's true if it's raised after as well. And the difference is the government can move to reopen it as opposed to the evidence if venue is raised as an issue at or before the close. Obviously, the government can't do that after trial. And if the court reviews the Morrissey decision, those reasons that venue is treated differently and the derivation of the waiver rules are discussed in that case. If I could move to ThinRam in the single conspiracy argument, ThinRam was not convicted of trafficking herself. She was convicted of joining an agreement of becoming a member of a sex trafficking conspiracy consistent with the law of conspiracy. The fact that other members of the same conspiracy committed substantive acts before she joined does not make her guilty or criminally responsible for them. She wasn't convicted of that To be convicted of those, there would have had to be a Pinkerton Theory of Liability instructed, and there was not. And Mr. Eng in his brief suggests that Pinkerton was smuggled into the case through the acts or statements standard instruction, and it wasn't. Pinkerton was not instructed in this case, and it was not a theory of liability used to convict Ms. ThinRam. Would you agree that that particular instruction is a little bit confusing at the end so that the instruction does talk about acts and statements that may be considered by you as evidence, but then the last line of it is saying that a person who joins an existing conspiracy becomes responsible for everything from the beginning? Your Honor, I think the way in which it reads that last sentence is it's explaining why. It says because. The reason why is because. It's explaining why the rule of law exists, that you can use the acts or statements of all conspirators to define the scope of the conspiracy. And appropriately so in instructing the jury. Now, I'd say a couple of things about that instruction. One, the defendant didn't object to it, that instruction, so if we're going to review whether that instruction's in there, we'd be looking at a plain air standard. It's clearly not plainly erroneous. It's an accurate statement of the law. Two, it's an evidentiary standard, not a Pinkerton liability standard. Three, it was not used as a Pinkerton liability standard, either in closing or otherwise. The government was explicit that, of course, it would be ridiculous, I think was the government's terms, to say that we were trying to convict NRAM based on the victimization of itself. So four, even if all those other hurdles were surmounted, in addition to the arguments in the government's brief, there's no prejudice here. There's no possible chance that the jury convicted NRAM based on trafficking of herself. There wasn't even any evidence, acts or statements in the record of anything her traffickers did or said when she was a victim of the conspiracy in terms of admissible evidence under that instruction. Your Honor, with two defendants left, I would turn to Imprada unless the court had additional questions on this. Imprada makes most of the argument with respect to restitution. The government agrees that the principle of whether joint and several restitute liabilities tends to conspirators is a key issue in the case, and the government suggests it does for two reasons. One, this court's general conspiracy law, which makes a conspirator liable for the reasonably foreseeable act of co-conspirators, applies to restitution. And the government cited in its brief the GAY case, G-A-Y-E, and I think the court could also look at the RAND case, which is cited in GAY from the Seventh Circuit, that also stands for that proposition. If the court wanted further support, it's in Rodriguez, which is this court's decision at 9-15, Feb. 3, 532. Secondly, Mr. Imprada argues that, well, the TVPA isn't as broad as the MVRA in allowing co-conspirator liability. What the TVPA provides in Section 1593-A-2 is that, quote, an order of restitution under this section shall be issued and enforced in accordance with Section 3664 in the same manner as an order under Section 3663-A. 3663-A is the MVRA. So, I'm not going to expound any more at length given the time, Your Honors, but if you if the court reviews 18 U.S.C. 1593-A-2, you will see that the TVPA incorporates, by reference, the MVRA and Mr. Imprada concedes that the MVRA includes joint and several restitution liability for co-conspirators. As to the evidentiary adequacy of the government's restitution submissions, I would depend on the earlier colloquy with Judge Kelley as well as the government's briefing and submissions below. With respect to forfeiture, the... Yes, the forfeiture hearing, Your Honor. You're going to address forfeiture. Go ahead. Yes, Your Honor. The district court in the government's reading construed a defendant as objecting to the fact that under 32.2B5A there was no jury retained to determine forfeiture at trial. And the government really suggests that that was addressed only, albeit by implication at trial, but in any event, the district court construed the post-trial motion to be a challenge to the lack of retention of the jury, which is a purely legal issue. I understand that, but I'm asking about the rule 32.2, and if it was an error not to hold a hearing, and if so, was it harmless? Yes, Your Honor. And I started there because that specific request for the hearing under 32.2 requested a hearing on the issue that was otherwise laid out at great length in the filing, I think it's 1728, from which court's questions derived. So the court construed the request for a hearing, that specific request that you're referring to, Judge Gallatin, construed it as a request for a hearing on what was otherwise the four corners of the defendant's submission, which related only to the retention of the jury. Now, Your Honor, if the court determines that that request should have been construed more broadly, and therefore the district court did err by not giving a hearing on issues other than the legal issue of jury retention, then the government would rely on what the court really intimated in terms of prejudice earlier, that it was not prejudicial error not to give the hearing. For example, the nexus on the cell phones, the submissions and arguments by the Council on Appeal were not submitted below, even though Ms. Amprada had two opportunities to submit briefing, both an initial and then a reply brief on restitution and forfeiture. So the government's position would be that if the court determines the request for a hearing encompass issues other than jury retention, that any such error was not prejudicial, was harmless. Well, say that last part again about the material that's submitted on appeal. Interesting. She should have submitted it outside of the context of a hearing in the district court? The arguments made about the nexus to the cell phone, which I think the court referenced, and Amprada's did have an opportunity to present those objections to the district court as a substantive matter, and didn't object on those grounds. Now, if the court determines, well, the request for a hearing was meant to encompass that, and the district court didn't give the hearing, it is harmless in the government's view because the record below adequately supported the nexus, and the arguments made on appeal were not made below. With respect to one... You're saying she could have raised the legal arguments about nexus in her papers? She had two opportunities to do so. Two opportunities. With respect to Ms. Wanless, Your Honors, and I wish I, of course, had more time, but I do want to... You had ten minutes at the beginning on other things, so... Well, I was trying to be responsive, Your Honor. I apologize if it wasn't productive for the court. I really do. I was trying, I was struggling with how to organize the argument. With respect to Ms. Wanless, Your Honors, there is a pattern here, first of all, that is in the record of making baseless accusations against the government, and when those accusations are proven false, making new accusations. Wanless alleged that we didn't have a chain of custody when we did, and she conceded as much below after being pointed out that we did. Alleged that... Alleged below that we hadn't provided the evidence to counsel before trial. And then when it turns out we had provided the evidence with respect to the 2013 case, she changes the argument. Here, her entire opening brief is devoted to the principle that this evidence wasn't recovered in 2017 in the colony, which, Your Honor, it absolutely was. Everything that is actual documentation in the case supports that. And this was evidence seized from Ms. Wanless, by the way, with respect to 2017. This is evidence from her place. But, after writing a principle brief that says the government lied about the evidence being recovered in 2017, in the reply brief, she says, for argument's sake, I'm now going to assume what the government said was accurate, and I'm going to make a series of arguments not made in the opening brief about why, if what the government says is true, that's wrong, too. Now, those arguments are clearly waived as not made in the opening brief, but they're illustrative of the pattern here, which is a house of cards built on baseless accusations, and when the house of cards falls, a new one is constructed, and you see that both below and on appeal. Now, the facts in this case let me respond to the court's inquiries on this. I'm otherwise going to have to rely on the record and the fact that the district court did not abuse its discretion in its orders, and that there was no Brady or prosecutorial misconduct. But, Your Honor, Judge Kelly asked if the materials were covered in the apartment of Casey Benson. The government does not concede that with respect to which materials were found where in 2013. Certainly, the evidence admitted at trial was found also in 2017 in Wanlis' apartment, but that's not to exclude the possibility, and in fact, Wanlis at first asserted, and the government agrees, that that material was originally found in apartments associated with Wanlis, that is, Wanlis and Duarte, her husband. Furthermore, in Wanlis' proffer, which is a matter of record, she says that Benson rented apartments for her in the course of the 2013 activity. So, even if it was in Benson's apartment, which the government doesn't concede, Benson isn't unrelated to the case. With respect to the allegations of Brady and prosecutorial misconduct, Wanlis has not shown that the government suppressed any evidence. In fact, almost without exception, the documents that she tries to use to establish suppression, the documents that the government provided to Wanlis before trial, is not established that they're favorable to defendants, that whatever she alleged was suppressed, but wasn't, would have been favorable to defendants, and doesn't establish that it would have made, that there's a reasonable probability that the result would have been different. Noone, who is Wanlis' partner in crime, testified at trial. The testimony of Noone corroborated by the jailhouse confession of Wanlis was enough to convict her. As to this idea of actual innocence, Wanlis, in her proffer, in her PSR, and at sentencing, conceded she was guilty. There should be no question here of actual innocence, and there's no question of sufficiency of evidence on the charges. Your Honor, the government takes its obligations seriously, and I think if the court reviews the government's filings below, replies and surreplies. The government replied in each and every instance to the allegations. As the allegations changed, the government replied to the new allegations. The government, in its brief to this court, establishes how Wanlis distorted the record in her opening brief, to imply that the government made admissions about the lack of disclosure that it did not make. There were no admissions. The government recovered evidence in 2017 that had also been subject of a law enforcement investigation related to Wanlis in 2013. And if the court reads the briefs in the district court record with that lens, the court will conclude as the district court did here, that the government committed no Brady or prosecutorial misconduct claims. The government would otherwise rest on its submissions in the record below, and appreciates the opportunity to argue this morning. Thank you. Alright, thank you for your argument. Thank you to all counsel. The court appreciates, by the way, the willingness of counsel for the appellants to accept their appointments under the Criminal Justice Act. The case is submitted. The cases are submitted, and the court will file a decision in due course.